LAND, Justice.
 

 The plaintiffs, Rodney L. Williams, Mrs. Geneva Williams Bilbray, and Mrs. Ferba Williams Skinner, all residents of Sabine parish, are the owners of % interest each in an 80-acre tract of land in that parish, described as the S. W. % of N. E. % and N. W. % of S. E. y4 of Sec. 32, Tp. 8 N., R. 11 W.
 

 Section 29 is immediately north of section 32.
 

 The defendant Pelican Natural Gas Company, Inc., on or about September 1, 1933,
 
 *465
 
 drilled a producing oil well on the S.W. % of S. E. % of section 29.
 

 The defendant Monroe Production Company, Inc., has drilled three wells, all of which were producers, on the S. E. % of S. W. % of Sec. 29.
 

 And the defendant George L. Pace has drilled three wells, all of which were producers, on the N. E.
 
 Y
 
 of N. W.
 
 Yi
 
 of Sec. 32.
 

 The Williams creek begins in section 29, north of these wells, and flows in a southerly direction through the lease of the Pelican Oil Company, and in close proximity to its well, and continues through the W. G. Bilbray tract, and throught the Williams 80-acre tract in section 32, and is dammed up at the southern boundary of that tract to form a pond, which covers about an acre of ground.
 

 A branch of. the Williams creek, west of the main creek, flows from the lease of the Monroe Production Company, and a fork of this branch flows from the lease of George L. Pace. This branch and its fork are also in close proximity to these wells.
 

 Petitioners allege that all of these wells produced salt water along with oil; that the wells produced about 2,000 barrels of salt water a day; that since September 15, 1933, the defendants have been negligently allowing all the salt water and waste oil produced iron these wells to run into the Williams creek and its branches, and flow down the Williams creek upon the lands owned by petitioners, and into the pond made by petitioners, to their great injury and damage.
 

 Alleging amicable demand in vain, petitioners claim damages against defendants in solido, in the full sum of $4,950, itemized as follows:
 

 For loss of 4,000 fish in pond.... $ 800.00
 

 For destruction of pond dam.... 500.00
 

 For loss of use of pond for swimming purposes............... 250.00
 

 For loss of sale of water to oil companies in 1934............ 3,000.00
 

 For loss of water for stock to drink ....................... 100.00
 

 For loss of timber killed by salt water ...................... 300.00
 

 Total.....................$4,950.00
 

 Judgment was rendered in the district court for the parish of Sabine against defendants in solido in the sum of $3,400, with legal interest from date of judgment, the damages awarded being itemized as follows :
 

 For death of fish............... $ 400.00
 

 For damages to timber.......... 250.00
 

 For loss on swimming rights.... 250.00
 

 For cost of construction of pond dam ........................ 500.00
 

 For loss of sale of water to oil companies in 1934..........■.. 2,000.00
 

 Total..................... $3,400.00
 

 (1) The item of damages of $100 for loss of water for stock to drink was properly rejected by the trial judge for the reason that Rodney L. Williams, one of the plaintiffs, testified that, when the pond became polluted from waste oil and salt water, water was provided for the stock by turning them out. Tr. p. 193.
 

 (2) Nor, in our opinion, does the testimony sustain the item of $400 for death of fish.
 

 
 *467
 
 There can be no doubt that 4,000 small fish were obtained by plaintiffs from the hatchery at Alexandria through the State Conservation Department, and were placed in the pond made by plaintiffs. Nor can there be any doubt that a number of these fish died from the effect of salt water and waste oil that were drained by defendants from their wells into Williams creek and eventually into this pond. A great many dead fish were found in the pond, but no witness pretends to state with exactness the number. Besides, there was an unscreened 10-inch pipe placed in the dam to the pond, to lower the water to a stage where it would not kill timber along the banks of the Williams creek. The fish, of course, could escape from the pond through this pipe into Williams creek, which continues to flow for a considerable distance below the pond.
 

 The testimony also shows that in normal times, beginning at the upper end of the pond, the average width of the water up the creek, for a quarter of a mile, is from 6 to 8 feet, with an average depth of 4 feet. There is also testimony to the effect that fish go upstream in the spawning season and downstream in other seasons. There is also an unscreened waste-way up the pond and around the curve from the dam. It was there before the pond was made and is a natural drain for Williams creek when the water is up. This is also another avenue of escape for the fish.
 

 As the dead fish in the pond were not counted, and as it is impossible from the evidence to ascertain how many fish may have escaped through the unprotected 10-inch pipe and waste-way, plaintiffs cannot recover, either for the 4,000 fish placed in the pond or for any specified number of the fish.
 

 The item of $400 for dead fish is therefore rej ected.
 

 (3) As to the claim of $250 for loss of timber.
 

 In the assessment of damages in cases of tort, and where there is no exact test, much discretion must be left to the judge or the jury. Rev.Civ.Code, art. 1934, subd. 3.
 

 Mr. C. N. Bilbray, who testifiecf for the plaintiffs as to the amount of the timber killed as the result of the salt water flowing over plaintiffs’ property, was in charge of this property during the time that the damages were sustained.
 

 He had had nine years of service in the Forestry Department of this state and one year in Florida, and had had twelve years of experience in estimating timber.
 

 In estimating the amount of timber killed by salt water, the witness used a scale stick, recognized by both State and Federal Forestry Service.
 

 His estimate as to the amount of timber killed by salt water exceeds the amount allowed by the lower court. The trial judge, however, visited the property involved in this suit, and made a personal inspection of same, as there was a conflict between the witnesses of defendants, sent upon the property to make an estimate, and the estimate made by Mr. Bilbray. Although the estimate made by defendants’ witnesses shows that much of the timber that grew along the banks of Williams creek running through plaintiffs’ property was dead, yet
 
 *469
 
 ■it is insisted by defendants that no damage should be allowed for the loss of timber.
 

 Mr. Bilbray testified that, in making his ■estimate, he took into consideration only the timber that grew along the edge of the creek and which was killed by salt water, but that he did not take into consideration the timber that stood upon the high banks and the timber that grew along the edge of the creek, ■and which was not affected by the salt water.
 

 This witness was careful to call the attention of the lower court to the fact that all ■of the timber shown in his estimate was not completely dead.
 

 As the testimony is conflicting as to the estimate of the dead timber, and as the trial judge made a personal inspection of the property, and was in a much better position to determine the actual amount of dead timber than are the members of this court, we cannot say, with any degree of certainty, that he erred in awarding plaintiffs damages in the sum of $250 for the dead timber. This item is therefore allowed.
 

 (4) As to damage of $250 for loss of swimming rights.
 

 Rodney L. Williams, one of the plaintiffs, testified that he built bath houses in 1932 near this pond, and used them in 1932 and some in 1933; and that he realized $250 from the use of this pond for swimming purposes; that, since the fall of 1933, he has not used the bath houses for any purpose because the water in the pond had become polluted. Tr. pp. 194, 195, 198.
 

 The swimming pool was operated by Mr. Williams and Joe Price, as partners, in the summer months of June, July, and August, 1933. Tr. pp. 222, 223.
 

 Mr. Williams testified that his share was $125, after expenses were .deducted; and, of course, his partner received the other half. Tr. p. 226.
 

 The swimming pool was not opened in 1934 because of the polluted condition of the water from salt water and waste oil from defendants’ wells. Tr. p. 227.
 

 The testimony of Mr. Williams is corroborated by Mr. Bilbray, both witnesses for plaintiffs, that these bath houses were built on the banks of the pond; that the pond was used for bathing purposes in the summer of 1933; and that Mr. Williams and Joe Price operated the bath houses “jointly until they dissolved partnership, and .he (Mr. Williams) operated it alone.” Tr. p. 107.
 

 This suit was filed August 28, 1934, and is for the loss of swimming rights
 
 for the
 
 year, 1934, after the dissolution of the partnership. As the partnership was dissolved in 1933 and, thereafter, Williams operated the pond alone, it is clear that his former partner, Joe Price, has no interest in the present suit. The contention of defendants that plaintiffs should recover only one-half of the sum sued for is, therefore, untenable.
 

 The item for $250 for loss of swimming rights is allowed.
 

 (5) As to damages for destruction of pond dam in the sum of $500.
 

 The cost of this dam was paid for by plaintiffs. Mr. Rodney L. Williams and
 
 *471
 
 Mrs. C. N. Bilbray both testified that the dam cost $500; and Mr. Claude N. Bilbray, witness for plaintiffs, testified that it cost that sum.
 
 ¡
 

 In the face of such cumulative testimony, the contention of defendants that these witnesses did not know the cost of the dam, because the bills that were paid at the time the dam was built had not been preserved, does not, in our opinion, rebut this testimony.
 

 This dam was built in May, 1931, before any salt water and waste oil were ever allowed to flow into the pond. Mr. Bilbray was present at the building of the dam, and the construction of 'the pond, and paid his wife’s proportionate part of the price. Tr. p. 82.
 

 He states in his testimony: “This is a spring branch, supported by springs that are strong springs, and support lots of water, and we have been figuring on building a fish pond here for a number of years, but since the oil field came in, realizing the revenues to be drawn from selling water for drilling purposes, we immediately built this pond, and it made a bend away out around one hundred feet, leaving all of this high ground in.the middle, and to make this pond not only for a fish pond, but for drilling purposes and swimming purposes,
 
 we excavated that and built this dam
 
 for three things : to be stocked for fish, for swimming purposes, and for the sale of water for drilling purposes.
 
 And we paid $7.50 a day for teams, and the excavation of that two hundred foot long, one hundred and ten foot wide, and it required quite a lot of dirt to be removed,
 
 and took considerable time, and the actual cost of it was five hundred dollars.” Tr. p. 82 and p. 83. (Italics ours.)
 

 The water in the pond, at its average stage, is from 8 to 10 feet deep.
 

 The length of the dam is 110 feet, because a narrow place was selected for the dam, and the width of the pond is 120 feet but, where the excavation took place, the length of the pond is 200 feet. Tr. p. 92.
 

 Before the dam was built, the width of the creek from bank to bank was 25 feet, but the east end of the dam was extended 85 feet from the east bank of the creek into a pasture. The average height of the dam from the east bank of the creek out to the extreme east end is from 8 to 10 feet. Tr. pp. 110, 111.
 

 The height of the dam bridging the channel of the creek, from the bottom of the creek at its deepest point to the top of the dam, will average 24 feet. The witness states that he measured it.
 

 Practically all of the time, Mr. Bilbray supervised the building of the dam. Part of the earth excavated was used to make the dam. Tr. p. 110 and p. 111.
 

 In speaking of the excavation in the pond proper, this witness states: “There was quite' a large place there. That that drains that particular place wasn’t wide, and it came around in quite a horseshoe, leaving that high ground out there. It was quite an item to excavate it; it was a big job.” Tr. p. 112.
 

 Some days there were three teams on the job, and some days there were four teams at $7.50 each per day. Probably, 60 per cent, of the dirt went into the dam. Tr. p. 114. •
 

 
 *473
 
 The witness states that he used his teams, Mr. Williams’ farm teams, a team of Mr. Boyd, and hired other teams, and that labor was also hired to remove some trees and stumps from the pond. Tr. p. 115.
 

 Rodney L. Williams, plaintiff, also names the following persons, who did work on the pond and dam and were paid: Mr. Mouser, Mr. Dave Boyd, and a number of daily hands who were paid each $2 a day. Tr. pp. 210, 211.
 

 The. witnesses tendered by defendants as experts in dam building do not, in our opinion, successfully rebut the testimony of plaintiffs. It would be rather difficult for them, at this date, to know how much excavating was required; and answers to mere hypothetical questions cannot, in the nature of things, outweigh the facts testified to by the three credible witnesses, who actually paid for the costs of the dam and pond. The work to be performed in this case was by no means a small job but was a large job, and the physical facts of the case tend largely to confirm the testimony of plaintiffs and their witnesses. The item of $500 is therefore allowed.
 

 (6) As to $2,000 damages for the loss of sale of water to oil companies in 1934.
 

 The ultimate facts in this case are that salt water and waste oil were found in the pond of plaintiffs in sufficient quantities to kill fish in the pond, to render the water unfit for swimming purposes, or for sale to oil companies for drilling purposes.
 

 Also the ultimate fact in this case is that there was a sufficient quantity of salt water in Williams creek to- overflow upon the lands of plaintiffs and to soak into the roots and kill timber on plaintiffs’ lands bordering on that creek.
 

 The property of plaintiffs in located in the heart of the Sabine parish oil field. Prior to September 15, 1933, salt water or waste oil had never entered Williams creek or the pond of plaintiffs. Prior to that date, plaintiffs had used the pond for swimming purposes, for fishing purposes, and for sale of water to oil companies for drilling purposes. But after the drilling of the wells of defendants, all of which are in proximity to Williams creek and its several branches, salt water and waste oil began to appear in .Williams creek and in the pond of plaintiffs, and there were no other wells in the vicinity from which the salt water and waste oil could have flowed into that creek.
 

 Map D 2 filed in evidence shows the location of all of these wells, and their prox- ' imity to Williams creek and its branches.
 

 All of these wells produced salt water, which flowed directly into Williams creek to the dam of plaintiffs’ pond. Tr. pp. 79, 80, 85.
 

 Mr. Bilbray, witness for plaintiff, testified that he knew of his personal knowledge that the water was salty, and that defendants allowed all the salt water and waste oil produced from their wells to flow into Williams creek and to come down on plaintiffs’ property. Tr. p. 94.
 

 The presence of salt water in Williams creek is fully established by the fact that the timber of plaintiffs was killed by the roots being saturated with salt water.
 

 Mr. Bilbray testified. that: “Where the roots of a tree are saturated with salt water,
 
 *475
 
 that a tree will be dead within a period of. three months, depending on just how much circulation it would have, and how close the salt water. That will, of course, reach out and kill trees, and they will continue to die for a year and a half.” Tr. p. 95.
 

 This witness was presented with various pieces of wood, gum, beech, oak, pine, cherry, sassafras, white oak, and iron wood and, upon examination, stated that the trees from which the specimens came were killed by salt water. Tr. pp. 96, 97, 98.
 

 Mr. Bilbray testified that he made small dams to contain oil and salt water from the wells of the Monroe Production Company and of George L. Pace; that these dams broke, and that the salt water flowed into Williams creek; that the Pelican Natural Gas Company began allowing salt water to flow down the Williams creek about the middle of September, 1933; that the Monroe Production Company brought in its first well July 9, 1933, and its second well in October, 1933; and that the Pace well came in and produced salt water in September, 1933. All the particulars of the testimony of Mr. Bilbray will be found at pages 98-103 of the transcript.
 

 This witness testified that all of the salt water produced by these three companies flowed into Williams creek, and that these defendants allowed all the waste oil to come down the creek with the salt water. Tr. p. 103.
 

 He also testified that so much of this waste oil was coming down Williams creek in December, 1933, January, 1934, and February, 1934, that he “set it afire and burned! it.” Tr. pp. 103, 104.
 

 The testimony of Mr. Bilbray is corroborated largely by the physical facts of the case, and was accepted as true by the trial judge.
 

 The trial judge allowed plaintiffs damages in the sum of $2,000 for the loss of the-sale of water from the pond to oil companies in the year, 1934.
 

 Plaintiffs contend that they could have-sold water in 1934 for the drilling of the-following 12 wells:
 

 Creighton Oil Company.......... 2 wells;
 

 The Texas Company............. 2 wells-
 

 George L. Pace................ 2 wells-
 

 Ben Smith...................... 1 well
 

 Pelican Natural Gas Company .... 5 wells-
 

 See testimony of C. N. Bilbray, Tr. pp.. 159-161, and testimony of Rodney L. Williams, Tr. pp. 238, 239.
 

 While plaintiffs claim that they could have sold water to the Creighton Oil Company, the testimony of Mr. M. H. Sneed is positive that his company only drilled one well in' Sabine parish in 1934, which was the Creighton-Williams well, on R. L. Williams land; in Sec. 6, Tp. 8 N., R. 11 W., Sabine parish, La. Tr.Vol. Ill, pp. 513 and 514.
 

 Mr. Sneed was a member of the contracting firm which drilled this well, and as to any purchase of water from these plaintiffs, he testified as follows:
 

 “Q. I ask you the direct question, whether or not you or your firm undertook to attempt to buy water from the Williams- pond,
 
 *477
 
 or from any other place, to drill the Cray-ton well ?
 

 “A.
 
 No, sir.
 

 “Q., Were you able to get free water without having to buy it to drill that well ?
 

 “A.
 
 Yes, sir.
 

 “Q. If Mr. Williams says that you undertook to buy water from him, and could not use it because it was salty—
 

 “A. I would say that he is mistaken.
 

 “Q. You did not do that?
 

 “A. No.” Tr. Vol. Ill, p. 514.
 

 The plaintiffs and the Texas Company were involved in a dispute as to a prior bill of these plaintiffs for water sold the Texas Company. Tr. Vol. II, pp. 348, 349. The evidence shows that this company, in any event, would not have purchased water from plaintiffs.
 

 Mr. A. C. Heflin, of this company, testified as a witness in the case as follows:
 

 “Q. Did the Texas Company drill any more wells in Sabine parish in 1934 ?
 

 “A. They did.
 

 “Q. How many?
 

 “A. Two.
 

 “Q. Who did they purchase water from?
 

 “A. Ben McCollister.
 

 “Q. Did the Texas Company endeavor to attempt to purchase any water from Rodney Williams or from the Williams pond in connection with the drilling of those other two wells?
 

 “A. They did not; they told us not to have any more dealings with them.
 

 “Q. Then you never did go to see Mr. Williams with reference to buying water?
 

 “A. I did not, no sir.” Tr. Vol. II, p. 349.
 

 As to any water which may have been sold to George L. Pace, Mr. Frank Pace testified :
 

 “Q. Did you say you did not use any water from the Williams pond at all ?
 

 “A. Yes sir, I drilled two wells from the Williams pond.
 

 “Q. And you quit using water from the Williams pond for what reason?
 

 "A. We built our own ponds.
 

 “Q. Why did you build your own ponds ?
 

 “A. Because I had a draw there to build them on, and I could save the twelve dollars a day I was paying Mr. Bilbray.” Tr. Vol. II, p. 477.
 

 As to the contention of plaintiffs that they could have sold water to the Pelican Natural Gas Company, Inc., for the drilling of five wells, Mr. John Bullock, field superintendent, testified as follows:
 

 “Q. Mr. Bullock, the plaintiffs have maintained that because of salt water in their pond in 1934, they were unable to supply water to the Pelican Natural Gas Company for the purpose of drilling five wells; I will ask you whether or not those statements are. true ?
 

 
 *479
 
 “A. No; we had a dam in the same creek ahead of theirs that really held more water than theirs held. ■
 

 “Q. Assuming that the Williams pond involved in this litigation had contained fresh water in the year 1934, would you have purchased water from the plaintiffs for the drilling of the Pelican Natural Gas Company’s five wells ?
 

 ■“A. No, sir.
 

 “Q. Why wouldn’t you have done that?
 

 “A. We had about as much water as they had in this place. We never bought water; we only bought water for eight wells out of the sixty some wells we have drilled there.” Tr. Vol. II, pp. 450,451.
 

 This leaves only one well mentioned by plaintiffs, a well drilled by Ben Smith, who used water from Williams creek and from drains running into it.
 

 The testimony of the two plaintiffs that they could have sold water in 1934 to the various defendants and oil companies named by them is flatly contradicted by a number of witnesses for the defendants. The Creighton Oil Company, Ben Smith, and the Texas Company are not parties to this suit, and have no interest in this litigation. The two plaintiffs are equally interested in the result of this suit with Mr. Bullock, testifying on behalf of the defendant, the Pelican Natural Gas Company, and with Mr. Frank Pace, testifying on behalf of George L. Pace, another of the defendants. All of the defendants’ witnesses have testified to good and valid reasons for not having agreed to purchase water from plaintiffs in 1934— they had their own water supply during that year. The Texas Company assigns, as a reason for not buying water, a former difference with plaintiffs as to a water bill. These witnesses have not been impeached, and, this court cannot assume that they are not credible witnesses merely because they may be employees of an oil company.
 

 Assuming that the two witnesses, the plaintiffs, and the witnesses for defendants are equally credible, it is clear that the preponderance of the evidence in this case is on the side of defendants, and that plaintiffs have failed to prove the item of $3,000 damages for loss of sale of water to oil companies in 1934.
 

 Besides, the claim of plaintiffs
 
 that they could have sold
 
 this water at the rate of $200 per well, is of a highly speculative character; and particularly so, as there is no evidence in the record to show the prevailing market price of water per well in the Sabine parish oil fields during the year, 1934; but plaintiffs have relied solely on prices per well received in the former years of 1932 and 1933. i , ;
 

 The item of $3,000 damages for loss of sale of water to oil' companies in 1934 is therefore rejected inmoto.
 

 (7) The exception of nonjoinder filed by all of the defendants was properly overruled, since the evidence in the case clearly shows that all of the defendants jointly contributed to the injury done to the property of plaintiffs by permitting salt water and waste oil from all of their wells to flow into Williams creek and to find its way into the pond of plaintiffs, and to spread over the timber lands of plaintiffs.
 

 
 *481
 
 Defendants are necessarily joint tortfeasors, under this state of facts, and judgment for damages was properly rendered by the lower court against all of the defendants, in solido, in the present suit.
 

 In a suit against only one of the defendants, it would not have been possible for plaintiffs to have shown that the wells of that defendant alone contributed to the injury and damage to the property for which plaintiffs sue in this case.
 

 . (8) The judgment appealed from by defendants is for the sum of $3,400 damages in favor of plaintiffs, with legal interest from date of judgment until paid. . It also maintains • the writ of attachment. herein issued against the nonresident defendant, George L. Pace.
 

 This judgment contains an award of $400 as damages for death of fish, and an award of $2,000 as damages for loss of sale of .water to oil companies in the year, 1934. Both of these items have been rejected by this court on appeal, and it becomes necessary to amend the judgment accordingly.
 

 It is therefore ordered that the judgment appealed from be amended by rejecting the item of $400, awarded therein to plaintiffs for death of fish in Williams pond, and by rejecting the item of $2,000, awarded therein to plaintiffs for loss of sale of water in 1934 to oil companies for drilling purposes, and by reducing said.judgment from the sum of $3,400 to $1,000.
 

 It is now ordered that said judgment, as amended and reduced, be affirmed; that plaintiffs, appellees, pay the costs of appeal, and that defendants pay all other costs.